MORGAN, by His Next Friend, TROLL, Respondent, v. C. HAGER & SONS HINGE MANUFACTURING COMPANY, Appellant.

St. Louis Court of Appeals, November 13, 1906.

1. PRACTICE: Minors: Appointment of Next Friend. Where the record of the trial court shows that the petition for the appointment of a next friend for a minor plaintiff was filed in open court with the written consent of the next friend to act and that he was thereupon appointed and on the back of the petition for the appointment was the filing mark of the clerk, this was sufficient to show that the appointment of the next friend was regular.

2. ———: ———: ———: General Issue. A defendant cannot question the validity of the appointment of next friend for a minor plaintiff by a general denial in the answer.

3. MASTER AND SERVANT: Safe Place to Work: Guarding Machinery. Whether a vertical belt and shaft rotating near the floor in a factory so that they were exposed to contact with the limbs and clothing of employees, were dangerous, and, if left unguarded, a violation of the statute, section 6433, Revised Statutes 1899, was properly submitted to the jury, in an action by an employee against the employers operating the factory for damages received by plaintiff from such machinery.

4. ———: ———: ———. And whether it was possible to guard such machinery without interfering with its free and effective operation and whether the failure to do so caused the plaintiff's injury, were questions properly submitted to the jury under the facts as examined in this case.

5. EVIDENCE: Dangerous Machinery: Hearsay. In an action for injuries to plaintiff, an employee of defendant, caused by dangerous machinery with which plaintiff was put to work, testimony of the State deputy factory inspector showing the report he made upon an inspection of the machinery was properly excluded as hearsay.

6. ———: Expert Testimony. Expert testimony is not admissible concerning matters which fall within the sphere of common experience and observation, things which are not of an unusual, scientific, or technical nature.

7. ———: ———: Dangerous Machinery. Whether a vertical belt and shaft rotating near the floor in a factory were dangerous, or sufficiently guarded, were questions to be determined

by the jury upon the facts as presented; the opinions of expert witnesses upon the subject were inadmissible.

3. **PRACTICE: Excessive Verdict.** In an action for personal injuries, where the testimony tended to show the plaintiff's leg was broken and the injury was more or less permanent, a verdict for $1,500 was not excessive.

9. **CONTRIBUTORY NEGLIGENCE: Ordinary Care: Minors.** In an action by a minor for personal injuries where the defense was contributory negligence, an instruction that "ordinary care" as applied to the plaintiff meant such as a boy of his age, intelligence, capacity and experience would usually exercise in the same circumstances, was proper.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher*, Judge.

AFFIRMED.

*Rassieur, Schnurmacher & Rassieur* for appellant.

(1)     The statute requires the belting, shafting and gearing of a machine to be guarded only if so placed as to be dangerous to persons employed thereon or thereabouts, while engaged in their ordinary duties; and then only if guards are practicable, and will not interfere with the effective operation of the machine.  R. S. 1899, sec. 6433; Bair v. Heibel, 103 Mo. App. 621; Lore v. Amer. Mfg. Co., 160 Mo. 608; Colliott v. Amer. Mfg. Co., 71 Mo. App. 163.     (2)     Deputy State factory inspector Jones, having testified that he was familiar, by reason of his official duties, with machinery in general, should have been allowed to testify whether, in his judgment, the machine was sufficiently guarded for its ordinary operation.  All jurors are not expected to be familiar with machinery or the methods of guarding machinery, and therefore expert evidence was proper.  Benjamin v. Railroad, 50 Mo. App. 602; Skinner v. Glass Co., 103 Mo. App. 650; Boettger v. Iron Co., 124 Mo. 87.     (3) Plaintiff failed to make out a case sufficient to go to the jury, because he failed to show that before the filing of

the petition herein, there was filed in the office of the clerk of the circuit court: (1) the petition for the appointment of a next friend; or (2) the written consent of the next friend to act; or (3) the order of appointment. R. S. 1899, sec. 556; Porter v. Railroad, 60 Mo. 160; Casler v. Chase, 160 Mo. 424; Cohn v. Railroad, 182 Mo. 577.

*Earl M. Pirkey* for respondent.

(1) It is improper for a witness to give in evidence his opinion that a machine is or is not in a certain condition when the existence of such condition is an issuable fact. Nash v. Dowling, 93 Mo. App. 164; Miller v. Canton, 112 Mo. App. 331; Livery Co. v. Railroad, 105 Mo. App. 560; Allen v. Transit Co., 183 Mo. 437; Koenig v. Railroad, 173 Mo. 698. (2) In the absence of evidence to the contrary, a public officer is presumed to have done his duty. McCallister v. Ross, 155 Mo. 94; State ex rel. v. Crumb, 157 Mo. 556; State ex rel. v. Hawkins, 169 Mo. 621. (3) The introduction in evidence of the order appointing the next friend is all the proof required on the subject of next friend by the plaintiff. Henderson v. Kansas City, 177 Mo. 48. (4) After verdict for an infant it is immaterial whether any evidence was offered to prove the appointment of a next friend unless the answer affirmatively raises the defense of incapacity of plaintiff to use. R. S. 1899, sec. 672; Baxter v. Transit Co., 95 S. W. 856. A boy is required to exercise that degree of care usually exercised by boys of his age and capacity. Spillane v. Railroad, 135 Mo. 423; Ruschenberg v. Railroad, 161 Mo. 86; Rogers v. Printing Co., 103 Mo. App. 688; Fry v. Transit Co., 111 Mo. App. 324; Van Natta v. Railroad, 133 Mo. 21.

STATEMENT.—Plaintiff, a minor, sued defendant by. next friend, for an injury sustained in defendant's factory. The injury was a fracture of a leg and occurred

while plaintiff, then about fourteen years old, was an employee of defendant. Defendant is a corporation engaged in the manufacture of hinges in the city of St. Louis. Plaintiff had worked in the factory about two months prior to the accident, but had been occupied on the machine which hurt him but a day or two. However, he was aware of the mode in which it was operated. This machine is called a "pin-pointing" machine. Its use was to grind points on small iron rods less than the size of a lead pencil and three or four inches in length, used to go through orifices in the backs of the wings of hinges to fasten them together. Plaintiff's task consisted in taking one of the little rods and putting it in a groove in a part of the table of the machine, whence it was moved automatically to another part of the machine, ground to a point at one end and ejected into a tank or barrel at the other side. The groove in which plaintiff laid the rod was in an appliance called a conveyer. This appliance carried the rod to the other appliances of the machine to be sharpened or ground. Plaintiff received some directions when he was put to work as to how he was to perform his task. The table of the machine was about three feet in width and six in length. It was set immediately south of the north wall of the building, but not against the wall. Just behind it, in the north wall, was a window. A board extended from this window to the table and while plaintiff was at work he sat astride of this board. Hence he faced south and in working would lay a rod in a groove of the conveyer at the west side of the machine, that is, at his right hand; the rod would be carried by the conveyer eastwardly, sharpened to a point and dropped into a receptacle at the east side. As we understand, there was a covered metallic tank just at the right or west of the table and a trifle to the north of it, on top of which plaintiff kept a supply of rods in an iron pan. The pan had a handle at either end and was rather

120 App.—38

heavy, weighing fifteen or twenty pounds. Still to the right of the tank was what is called a pillow-block, which is a metal structure whose dimensions are variously given; its height being estimated at from one and a half feet high to a foot, and its breadth at the top at from nine to five inches. The pin pointing machine was operated by a horizontal metal shaft which ran under the table; its ends, we believe, resting in sockets in this pillow-block. The shaft was rotated by power conveyed to it by a vertical belt which ran on a pulley near the ceiling of the room. On the horizontal shaft below were a loose and a tight pulley. To rotate the shaft the belt was put on the tight pulley, and to stop it the belt was shifted to the loose pulley. An appliance called a shifter was used for this purpose. West of where plaintiff worked was an old machine and between that one and the one plaintiff used, was an open space or aisle, estimated by the witnesses to have been from eighteen to thirty inches in width. When the supply of rods in the pan on top of the tank was exhausted, plaintiff would refill the pan from a large vessel of some kind immediately to the left or east of the machine. To get to this vessel in which the rods were kept, plaintiff would have to go into the aisle west of the machine, then walk around south of the machine to the east side where the vessel was. He had to refill the pan five or six times a day. He testified that before doing so he would shift the belt on the loose pulley so as to stop the running of the machine. To do this he swore he used the shifter and took hold of it with his hand. One of plaintiff's hands had been slightly injured a day or two before the accident, and hence he had not the full use of it in lifting the heavy pan from the top of the tank or can in order to carry it to the east side of the machine and refill it with rods. There was a box just south of the tank on which the pan rested, and to help himself in getting the pan off the can, plaintiff would put one

foot on the top of that box, lift the pan and lower it onto his knee and then carry it to the vessel east of the machine. The tank on which the pan ordinarily rested was about two and one-half feet high, and the box on which plaintiff would put his foot about seven inches high. According to plaintiff's testimony the can or tank on which the pan sat was about on a line with the vertical belt which operated the machine. Plaintiff said he got hurt in this way: The supply of rods in the pan having become exhausted, he got off his seat on the board and went around to the west side of the pointing machine to lift the pan from the tank. He then put his foot on the low box and was about to get hold of the iron pan and lift it when his foot was caught between the belt and the pulley, breaking his leg. Plaintiff stated several times that he did not know how his foot got caught. He said he was in the aisle when this happened and was just about to take hold of the box with his right hand when his overalls were caught and his foot drawn in between the belt and the pulley. The belt broke and freed his foot after his leg was broken. This testimony was given regarding the extent of the injury:

"Q. Now state what you found each time, Doctor? A. He has evidences of a fractured right leg about five inches above the ankle and some involvement of the tissues around the bone.

"Q. What do you mean by a fracture? A. Breaking of a bone.

"Q. Breaking of a bone? That was in the right leg? A. Yes, sir.

"Q. In the leg, between the knee and the ankle how many bones are there? A. Two.

"Q. What is the condition of those bones? A. There is evidence of a fracture of both bones.

"Q. The limb now, what is its condition as to being in the shape of a normal limb? A. It is deformed and bent and somewhat weakened and larger by reason of

the tissues being involved around about the fracture. There is a thickening of the tissues, and a thickening of the tendons, immediately below the site of the fracture.

"Q. Will that interfere with the use of the leg? A. Well, it weakens it some; it will be a good weather indicator; he will feel the changes of the weather, which will be manifested by pain. He will find it weaker than the other limb.

"Q. Are those conditions permanent, in your opinion? A. I think so.

"Q. The pain will remain and the deformity of the limb? A. Yes, sir; the deformity won't change. The tissue thickening has remained since last fall. The circumference at that point I think is about a half an inch larger than the other leg.

"Q. Where the tendons are involved, will that remain? A. Yes, sir.

"Q. It will continue to be a weather indicator and pain him in bad weather? A. Yes, sir."

Plaintiff's testimony gives the impression that he had shifted the belt onto the loose pulley before he put his foot on the box and reached for the pan, and that his foot caught between the loose pulley and the belt.

There are two paragraphs in the petition. The first counts on common law negligence in maintaining the machine, belts and pulleys in an unsafe condition and negligently putting plaintiff to work with them, knowing he was youthful and inexperienced, and without protecting or warning him against the danger of using the machine or being in the aisle. The second paragraph is founded on the statute requiring belting when so placed in factories as to be dangerous, to be guarded. It alleges a violation of this statute in leaving the belting and pulleys on the horizontal bar unguarded, and that in consequence plaintiff got hurt. The answer contained a general denial and a special plea in bar to each of the counts of the petition. To the first count it was pleaded that plaintiff was guilty of negligence which

directly contributed to the accident in this; that he was fully instructed in the use of the machine and told to shift the belt from one pulley to the other by hand and not otherwise; that instead of doing this he undertook to shift the belt by putting his right foot on the fork of the shifter and it was caught. To the second, paragraph of the petition a similar defense was pleaded. The pleas in bar were put in issue by a reply in the form of a general denial. One defense relied on is that plaintiff failed to show that before filing his petition, there was filed in the office of the clerk of the circuit court a petition for the appointment of a next friend, the written consent of the next friend to act and the order of appointment. The order of appointment was put in evidence. It showed that Harry Troll was appointed next friend and recited that Troll had consented in writing to act in that capacity. His written consent was not introduced, nor was the petition for the appointment. But the record shows that the court asked to see the petition for the appointment of a next friend before making the order and it was exhibited. On the back of it was the following indorsement: "1905; Nov. 17th. Petition for appointment of next friend. Harry Troll appointed next friend as prayed."

One of the deputy factory inspectors of the State was interrogated, while on the witness stand, as an expert regarding the safety of the appliance by which plaintiff was injured, and an exception was saved to the exclusion of certain testimony which he would have given. The examination of this witness on the immediate point was as follows:

"Q. You are familiar then, as a part of your business, with the operation of machines of this character? A. Not specially of that character. No, sir.

"Q. I don't mean that particular machine, machines of this kind? A. Yes, sir.

"Q. Did you, in your judgment, find that machine

sufficiently guarded for its ordinary operation? Objected to as incompetent.

"Objection sustained; to which ruling of the court, counsel for the defendant then and there duly excepted.

"Q. What report, if any, did you make on the character of the protection that you found about that machine? Objected to as incompetent.

"Objection sustained; to which ruling of the court, counsel for the defendant then and there duly excepted.

"The Court: The objection to the first question is sustained on account of the form of the question. The second calls for the report he made, which is hearsay and therefore not proper. If you want to have his opinion as to whether it was practical to box the machine, you are entitled to that.

"Q. Was this machine for ordinary, practical purposes and without interfering with its ordinary operation, in your judgment and opinion, guarded?

"Objected to. Objection sustained, to which ruling of the court, counsel for the defendant then and there duly excepted.

"Q. I will ask you whether, when you find a machine in a factory not sufficiently guarded to comply with the statutory provisions, whether you require the owner or manager of the factory to place guards about it?

"Objected to. Objection sustained; to which ruling of the court, counsel for the defendant then and there duly excepted.

"Q. Did you make any order on C. Hager & Sons Hinge Manufacturing Company of any kind in respect to this machine after you had made your visit and examination?

"Objected to. Objection overruled.

"A. No, sir.

"Q. Why, not?

"Objected to. Objection sustained; to which ruling

of the court, counsel for the defendant then and there duly excepted.

"Q. You didn't require anything further to be done, I understand, with reference to this machine after you inspected it?

"Objected to. Objection overruled.

"A. No, sir."

On cross-examination he testified as follows:

"Q. At the time you examined that machine did you knew whether men or boys had occasion to use that machine? A. No, sir.

"Q. Did you know what duties were personally required to be performed at the machine? A. No, sir; except in a general way; I was told.

"Q. Did you know or receive any intimation that the person using it would put his feet up on the box as this plaintiff described? A. What is it?

"Q. Did you know that the person using that would have occasion to go in this aisle and put his foot up on the box and reach up on this tank?

"Objected to.

"A. No, sir.

"Objection sustained and the answer stricken out."

Defendant contends that the pin-pointing machine was sufficiently guarded by the pillow-block on the west and the receptacle in which the rods were kept on the east; laying particular stress on the protection afforded by the pillow-block, because it was on the west side and by the aisle where plaintiff was standing when injured.

For the plaintiff the court gave these instructions:

"The court instructs the jury that if they find from the evidence that the plaintiff William C. Morgan was on the 15th day of September, 1905, in the service of defendant in the hinge factory mentioned in the evidence and that he was required by said service to work at and about the pin-pointing machine mentioned in the evidence; and if the jury further finds from the evidence that the vertical belt mentioned in the evidence and the

shaft mentioned in the evidence and upon which the loose pulley mentioned in the evidence ran, were so placed as to be dangerous to plaintiff while engaged in the ordinary duties of his employment in said factory at and about said pin-pointing machine and that said belt and shaft were not safely and securely guarded, and that they could have been safely and securely guarded without preventing their free working and operation or the free working and operation of said pin-pointing machine, and without preventing the necessary access to said belt and shaft and machine; and if the jury further find from the evidence that on said September 15, 1905, that because said belt and shaft were not so guarded that said belt and one of said pulleys caught plaintiff's right leg and foot and drew them between said belt and said loose pulley and thereby broke his said leg between the knee and ankle and injured and bruised his right leg and foot, and that plaintiff at the time he was so caught, if the jury find from the evidence he was so caught, was engaged in the ordinary duties of his employment in said factory and was in said aisle in discharge of his said duty, and was exercising ordinary care for his own safety; and if the jury further find from the evidence that the defendant knew, or by the exercise of ordinary care on his part for the safety of plaintiff, would have known that said belt and shaft were so placed as to be dangerous to plaintiff while engaged in his ordinary duties in said factory at and about said pin-pointing machine, and that said belt and shaft could have been safely and securely guarded without preventing their free working and operation or the free working and operation of said machine, and without preventing the necessary access to said belt and shaft and machine, in time by the exercise of ordinary care to have safely and securely guarded said belt and shaft before the alleged injuries to plaintiff, and that defendant failed to do so then the jury will find for the plaintiff, unless they further find from

the evidence that plaintiff had been instructed not to move the shifter with his feet or foot and that he shifted or tried to shift said vertical belt by putting his feet or foot upon the shifter and that thereupon he slipped and was caught between the belt and pulley whereon the same operated and thus received the injuries of which he complains.

"2. The court instructs the jury that 'ordinary care' depends upon the facts of each particular case; as used with reference to the plaintiff William C. Morgan, it means such as a boy of his age, intelligence, capacity and experience, as shown by the evidence would usually exercise in the same situation and circumstances as those of plaintiff.

"Failure to exercise such care constitutes 'negligence' in the sense in which that term is used in these instructions with reference to the plaintiff."

The court refused these instructions requested by defendant:

"1. The court instructs the jury that under the pleadings and the evidence in this case, the plaintiff cannot recover and their verdict must be for the defendant.

"2. If the jury believe and find from the evidence that plaintiff received the injuries of which he complains, by sticking his foot near the belting and pulleys operating the pin-pointing machine at which he was employed, and that his duties did not require that he do so, then the plaintiff cannot recover and your verdict must be for defendant."

To the giving of the instructions asked by plaintiff and refusal of the foregoing instructions asked by defendant, the latter excepted.

The following instructions were given on defendant's request:

"The court instructs the jury that in this case the plaintiff seeks to recover a verdict for the injuries sus-

tained by him, on the ground that the defendant was guilty of negligence in the following particulars:

"1.   That the pointing machine at which plaintiff was employed was defective, dangerous and unsafe for ordinary and reasonable use, by reason of the claim made by plaintiff that the vertical belt and lower pulleys connected with said machine were liable to strike and catch plaintiff when he was in the aisle on the west side of said machine and that there was no way by which he could stop said belt and pulley on which it was running.

"2.   That said aisle was too narrow to enable plaintiff to work about said machine with safety; and

"3.   That the belt, lower pulleys and the shaft which they were on were not safely and securely guarded.

"Before the plaintiff can receive a verdict at the hands of the jury, he must establish the negligence thus complained of by him and if he has failed to do so the verdict of the jury must be for the defendant.

"The court instructs the jury that the laws of this State require the belting, gearing and drums in manufacturing, mechanical and other establishments to be safely and securely guarded only when the belting, gearing and drums are so placed as to be dangerous to the persons employed therein or thereabouts while engaged in their ordinary duties, and then only whenever said belting, gearing and drums are so situated as to admit of guards being placed about them, without interfering with their free operation or with necessary access to them, or necessary passageway by or around them. The guards so required are such as to be safe and secure in the protection of the employees from contact with the machinery by the use of ordinary prudence and caution on their part. This duty which is imposed by the law upon the employer, does not make him an insurer of the safety of the employees. The guards which it is his duty to provide are such as will protect the employees, provided the employees use ordinary care against all

dangers that can be foreseen by ordinary human foresight; but the employer is not required to guard against the negligence of the employees nor against such dangers or accidents as human knowledge and human experience cannot duplicate.

"Now, if in this case you find and believe from the evidence that the plaintiff at the time of the injuries complained of, was in the employ of the defendant in its factory, and that he was engaged at the time in attending a machine designated to point pins and that said machine was operated by means of belting, shafts and pulleys; and if you further find and believe from the evidence that said belting, shafts and pulleys were so situated or placed as to be dangerous to persons employed about the same while engaged in the performance of their ordinary duties; and if you further believe from the evidence that such machine and the belting, shafts and pulleys thereof were at the time so situated as to admit of guards being placed about such belting, shafts and pulleys without interfering with their free operation or with necessary access to them or necessary passageway by or around them, then it was the duty of the defendant to place guards about said belting, shafts and pulleys, of such character as would protect any employee while engaged in the performance of ordinary duties with or around said machine, and while exercising ordinary care against the dangers that could be foreseen or anticipated by ordinary human foresight.

"If, on the other hand, you believe that the belting, shafts and pulleys on and about said machine were not so placed as to be dangerous to persons employed thereon or thereabouts while engaged in their ordinary duties, or if you believe that guards would have interfered with the free operation of said machine or with the necessary access to said machine or necessary passageway by or around said machine, then it was not the duty of defendant to place guards on or about said belting, shafts and pulleys.

"The court further instructs the jury that even if they should find and believe that the machine in question was out of repair; that the west aisle was narrow; and that the belting and pulleys connected with said machine were not guarded; yet if the jury should find and believe from the evidence that neither of these matters caused plaintiff to receive the injuries of which he complains, their verdict must be for defendant.

"The court instructs the jury further that if they find and believe from the evidence that plaintiff was not in the aisle immediately west of the pin-pointing machine at the time he was injured, but was in front of said machine, or on the north thereof, then they will find for the defendant.

"If the jury find and believe from the evidence that at the time when the plaintiff was employed to work at the pin-pointing machine, he was instructed by defendant's employee in charge of the pin-pointing department in the use of said machine and was instructed that in shifting the belting from one pulley to the other he was to move the shifter with his hands, and was instructed not to move the shifter with his feet; and that on the occasion when plaintiff received the injuries complained of he attempted to move the shifter with his foot and that by reason thereof he received the injuries in question, then your verdict must be for defendant.

"If the jury believe and find from the evidence that the injuries sustained by the plaintiff were due to his own want of ordinary care and prudence at the time he received said injuries, then your verdict must be for the defendant.

"The court instructs the jury that they cannot return a verdict in this case for the plaintiff merely because he sustained injuries while in the employ of the defendant; before they can return a verdict for the plaintiff they must find that the defendant was guilty of negligence as pointed out in the other instruction and that

plaintiff did not contribute to his injuries as pointed out in said other instructions.

"The court instructs the jury that when the plaintiff took employment in defendant's factory he assumed all the ordinary risks incident to the service; that is, all those risks which are part of the natural and ordinary method of conducting the business.

"By the term 'ordinary care' as used in these instructions with reference to the defendant, the court means that degree or amount of care which persons of ordinary prudence, thought and foresight would have exercised under like or similar circumstances; and the failure to exercise such amount or degree of care constitutes 'negligence' as that term is used in these instructions with reference to the defendant."

The jury returned a verdict in plaintiff's favor assessing his damages at $1,500, and defendant appealed.

GOODE, J. (after stating the facts). 1. The record shows the petition for the appointment of a next friend for plaintiff was filed in open court, together with the written consent of Troll to act as next friend, and that the court thereupon appointed Troll. On the back of the petition was the filing mark. These proceedings for the appointment of a next friend we consider regular. Moreover, it may be observed that if the validity of the appointment was denied, it was by the general denial contained in the answer, which was ineffectual to raise an issue regarding the matter. [Baxter v. Transit Co., 198 Mo. 1, 95 S. W. 857.]

2. The main instruction for the plaintiff submitted the case stated in the second paragraph of the petition, which declared on the statute requiring belting, shafting, gearing and drums in factories to be securely guarded when possible. [R. S. 1899, sec. 6433.] A prima facie case for the jury was established for the plaintiff on that paragraph, if not on the first one. Defendant's counsel say there is no evidence that the belt

and the horizontal shaft resting on the pillow-block, were so placed as to be dangerous to employees while engaged in their ordinary duties in the factory, and, hence, it does not appear that to leave them unguarded was a violation of the statute. It is apparent that if the vertical belt and the shaft rotating near the floor, were exposed to contact with the limbs or clothing of employees, they were dangerous; or, at least, that a jury might well infer as much. The main purpose of the statute is to compel such appliances as plaintiff worked about, to be screened or guarded so employees, while in the discharge of their duties, will not have their clothing caught and their persons drawn into the machinery. Plaintiff swore his overall trousers were caught by the belt while he was engaged at his task, and his foot drawn between the pulley and the belting. The machinery in question fell within the effect of the statute and defendant was under the duty of guarding it, if this could be done. The possibility of doing it without interfering with the free and effective operation of the machinery, and whether the failure to do so caused plaintiff's injury, were submitted to the jury and, we think, rightly. [Colliott v. Mfg. Co., 71 Mo. App. 171; Lore v. Id., 160 Mo. 602, 621, 61 S. W. 678; Henderson v. Kansas City, 177 Mo. 477, 493, 76 S. W. 1045.] There was much testimony that no kind of guard was practicable because if a guard was used, the pulleys could not be oiled. Testimony was given in opposition to this theory; one witness swearing that a sheet-iron screen could have been put around the appliances and a slide left in it through which to oil the bearings and pulleys. Some witnesses swore such a guard would have rendered the machinery more dangerous, because when oiling it an employee could not see inside the screen and might get his hand caught. These were matters for the jury, the evidence not being of a conclusive character either way.

The proposition most emphasized on the contention

that plaintiff should have been nonsuited, is that the evidence shows the belt and shaft were sufficiently protected on the west side, where the accident happened, by the pillow-block. We have experienced great difficulty in realizing from the descriptions of the witnesses, just how the pin-pointing machine, the horizontal shaft, the vertical belt which operated it, the pillow-block and the tank on which the pan rested, were situated with respect to each other, and are not sure we know their exact locations. Our impression is that the tank, with the pan on it, was to the west of the table at which plaintiff sat and just north of the horizontal shaft; that the pillow-block was a slight distance further to the right; that plaintiff went around the pillow-block into the aisle and a little to the west and rear of the tank, and, when at that point, put his foot on the low box near the tank, in order to reach the pan, and while reaching for the pan with his foot on the low box, his clothing was caught by the belt and his foot drawn between it and the loose pulley. We are giving, of course, the impression yielded by plaintiff's testimony and stating the facts as we understand he related them. Defendant's contention is that the pillow-block sufficiently guarded the belt and shafting to prevent an employee from coming in contact with them; which amounts to saying that plaintiff's clothes could not have been caught in the manner he stated because the pillow-block prevented them from coming into contact with the belt. This proposition is by no means obvious from the evidence. There was a discrepancy regarding the height of the pillow-block, some witnesses saying it was not more than a foot high. If this was true, it is plain that when he reached for the pan, with his foot on the low box seven inches in height, the pillow-block would only reach five inches above plaintiff's foot, and if the width of the block was only five inches, as was sworn, his loose overalls might have been caught by the belt. The physical facts are not so conclusive that it

was impossible for the accident to happen in the manner plaintiff related, that we can disregard the finding of the jury on the issue; though, no doubt, strong proof was adduced of admissions by plaintiff that he got hurt in an effort to shift the belt with his foot. That testimony told against the truth of his statement on the stand, but we cannot accept it as conclusive against his case. The adequacy of the protection afforded by the pillow-block is not more obvious from the physical facts, than was that of the rods around the gearing by which the plaintiff in Lore v. Mfg. Co., supra, was hurt; and in that case whether or not the gearing was sufficiently guarded to constitute compliance with the statute, was held to be a question for the jury.

3. No error was committed in refusing to permit the deputy factory inspector to testify that the machine was sufficiently guarded when he saw it in January after the accident or to state what report he made to his superior, or that he made no order on defendant to install other guards. He was not permitted to answer the first question asked, which was his opinion as to the adequacy of the guards he found around the machinery, on account of the form of the question. The answer to the second question, regarding his report, was excluded on the ground that it called for hearsay evidence. The court remarked that he would permit the witness to state whether or not, in his judgment, it was practicable to box the machine. That was a question about which expert evidence was competent, and, in fact was received. However, defendant's counsel did not propound such a question to the inspector. The exception to the exclusion of his evidence goes mainly to the refusal to permit him to state that, in his judgment, the machine was sufficiently guarded. Waiving the point that, as propounded, the question was leading, we think the answer to it was inadmissible for the reason that it called for an opinion about a matter which was to be judged of by the jury from their observation and

experience, instead of from the testimony of experts. The line dividing those matters regarding which opinion evidence may be given from those as to which it may not, is vaguely defined. The general doctrine is that expert testimony is not admissible concerning things about which the opinion of one intelligent man is as good as another's. [Kent v. Miltenberger, 15 Mo. App. 480, 485.] The difficulty occurs in the application of the rule; that is to say, in determining whether or not the thing inquired about is of such a character that the average man, on being informed of the facts, can come to a sound conclusion about it by applying his own knowledge and judgment — whether it falls within the sphere of common experience and observation or is of an unusual, scientific or technical nature. [Protection Ins. Co. v. Harneer, 2 Ohio St. 456; Stillwater Turnpike Co. v. Coover, 26 Ohio St. 520; Sowers v. Duke, 8 Minn. 23; 1 Wharton, Ev. in Civil Cases (3 Ed.), sec. 436.] The inquiry regarding the degree of protection to employees in defendant's factory, furnished by the objects about the belt and shaft was equivalent to asking if the belt and shaft endangered employees when engaged in their ordinary duties. Now that, we think, was a matter which the jury were competent to determine after the facts had been stated by the witnesses. Such we apprehend to be the sound conclusion in view of the decisions in this State on analogous facts. In Brown v. Plank Road Co., 89 Mo. 152, the action was for damages for injuries received by plaintiff from a defective highway. Opinion evidence was offered on the question of whether the highway was in a dangerous condition, and was held to have been properly excluded, as the issue was one for the jury to decide from the facts proved. [See, too, Draper v. Ironton, 42 Wis. 696.] In King v. Railroad, 98 Mo. 235, 11 S. W. 563, the action was by a widow for the killing of her husband by a railway train. The accident oc-

curred at a public crossing. Several witnesses were asked whether or not the crossing was dangerous for use by persons unacquainted with it, and such evidence was held to be incompetent; the court saying that the witnesses should have been required to state the facts showing the surroundings and the location of the crossing and from those facts the jury should have determined whether or not it was dangerous. [See, too, Couch v. Railroad, 22 S. C. 557; Way v. Railroad, 40 Iowa 341; Tolson v. Coasting Co., 17 D. C. 39, 44.] In Baker v. City of Madison, 62 Wis. 143, it was held that a city surveyor, civil engineer and superintendent of streets could not express an opinion as to whether a street gutter was in a safe or an unsafe condition; and the like ruling was made in Weeks v. Lyndon, 54 Vt. 638, regarding expert testimony that a bridge was reasonably safe. In Amstein v. Gardner, 134 Mass. 4, 9, expert testimony to show that a cattle-guard was necessary at a particular point on a railroad was held to be inadmissible. In St. Louis, etc., Railroad v. Ritz, 33 Kan. 404, opinion evidence regarding the sufficiency of cattle guards was excluded. Whether or not the machinery by which plaintiff was hurt was so guarded as to protect employees from the needless risk of their clothing or persons getting caught or whether it was dangerous to them, were questions the jury was called on to find; and they were competent to determine them from their own knowlege of such matters.

4. The verdict was not, in or opinion, so plainly excessive that we would be justified in disregarding the jury's conclusion. One physician testified that the limb was permanently distorted and that more or less pain would be felt by plaintiff.

5. We approve the instruction on the degree of care required of plaintiff. [Burger v. Railroad, 112 Mo. 238, 20 S. W. 439.]

The judgment is affirmed. All concur.